JANET M. HEROLD
Regional Solicitor
BRUCE L. BROWN
Associate Regional Solicitor
EDUARD MELESHINSKY (Cal. Bar No. 300547)
Trial Attorney
Office of the Solicitor
United States Department of Labor
90 7th Street, Suite 3-700
San Francisco, CA 94103
Telephone: (415) 625-7744
Facsimile:  (415) 625-7772
Email: meleshinsky.eduard.r@dol.gov

Attorneys for Plaintiff Secretary of Labor

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Martin J. Walsh,<br>   Secretary of Labor,<br>   United States Department of Labor,<br><br>                    Plaintiff,<br>              v.<br><br>Irwin Drug, Inc, an Idaho corporation.<br><br>                    Defendant. | Case No. _____<br><br>**COMPLAINT FOR VIOLATIONS OF 29 U.S.C. § 660(C)** |

COMPLAINT FOR VIOLATIONS OF 29 U.S.C. §660(C)

**INTRODUCTION**

1. Plaintiff Martin J. Walsh, Secretary of Labor, U.S. Department of Labor ("Plaintiff" or the "Secretary"), brings this action for injunctive and other relief, pursuant to Section 11(c) of the Occupational Safety and Health Act of 1970, as amended, (29 U.S.C. §§ 651-78) ("the Act"), seeking to enforce the provisions of Section 11(c) of the Act.

2. Jurisdiction of this action is conferred upon the Court by Section 11(c) of the Act, 29 U.S.C. § 660(c)(2).

3. Defendant Irwin Drug, Inc. ("Irwin Drug") is a pharmacy in Grangeville, Idaho, within the jurisdiction of this Court. Defendant Irwin Drug is now, and was at all relevant times, a person as defined in 29 U.S.C. § 652(4)-(6).

4. Mses. Sherri Conner and Krista Miller began working at Irwin Drug in 2012 and 2013, respectively, as lab technicians at the employ of Irwin Drug.

5. Mses. Conner and Miller's primary job duty consisted of compounding pharmaceuticals to fulfill approximately thirty to fifty patient prescriptions per day. The majority of their work involved handling hazardous materials including cancer-causing hormones in Irwin Drug's laboratory.

6. Idaho state law requires pharmacies that compound hazardous drugs to "[u]tilize a ventilated cabinet designed to reduce worker exposures while preparing hazardous drugs." Idaho Admin. Code R. 27.01.01.702.(02). Such ventilated cabinets may not "re-circulate[] air inside the cabinet or exhaust[] air back into the room environment," unless certain exceptions are met which are not applicable here. *Id*. at 02(c). Importantly, compounding "must be prepared in a dedicated Class II biological safety cabinet or a barrier isolator of appropriate design to meet the personnel exposure limits described in product material safety data sheets." Idaho Admin. Code R. 27.01.01.702(02)(a).

7. Class II cabinets reduce technicians' exposure to particles of hazardous materials by creating a negative air flow within an enclosed area which vacuums contaminated air toward a duct that vents outside of the laboratory. In this way, a user can open containers of hazardous materials inside the glass cabinet and mix two or more such materials while relying

COMPLAINT FOR VIOLATIONS OF 29 U.S.C. §660(C)

on the negative air pressure to act as a "gate" against between the user and the materials inside of the cabinet.

8. According to an email dated January 11, 2016 from Ms. Miller to Chad Jungert (Irwin Drug's sole owner and at various times pharmacist-in-charge), Irwin Drug did not provide any ventilated cabinets to allow laboratory technicians to move hazardous materials from large containers to smaller containers from which they would compound medications.

9. Durign the relevant time period, Irwin Drug maintained a single ventilated cabinet, which was shared between the two, and later three, lab employees to mix pharmaceuticals from the aforementioned smaller containers.

10. Irwin Drug's sole ventilated cabinet was not certified nor inspected prior to complaints from Mses. Conner and Miller. In addition, Irwin Drug's sole ventilated cabinet was Class I, not Class II, and thus re-circulated air back into the laboratory instead of venting contaminated air outside of the laboratory. Because the compounding laboratory was located in Irwin Drug's basement, Irwin Drug's failure to provide an engineering control which vented contaminated air outside of the laboratory exacerbated the extent to which Mses. Conner and Miller were exposed to hazardous materials.

11. Around middle to late 2015, Mses. Conner and Miller became concerned about their exposure to the hazardous materials they handled every workday.

12. On August 26, 2015, Ms. Miller emailed Mr. Jungert and Amber Blewett (office manager at Irwin Drug) expressing her concerns about the safety and health of the lab employees and the inadequacy of the ventilation cabinet.[1] Ms. Blewett promptly responded saying she would take action. However, because no action had been taken after several months, Ms. Miller subsequently emailed Mr. Jungert and Ms. Blewett several times between November 2015 and January 2016 about the status of the new equipment, the inadequacy and

---

[1] An additional employee, Mariah Middleton, joined Conner and Miller's complaints to Irwin Drug's management but did not file a formal complaint pursuant to the Act. Middleton resigned a few weeks after Conner and Miller were constructively discharged.

COMPLAINT FOR VIOLATIONS OF 29 U.S.C. §660(C)

1  need to service the sole ventilated cabinet, and Mses. Conner and Miller's concern for their
2  safety and health.
3      13.   On January 4, 2016, Mr. Jungert informed Ms. Conner that he would not
4  purchase any effective ventilated cabinets because of their expense.
5      14.   In early January 2016, Mses. Conner and Miller contacted the Idaho State Board
6  of Pharmacy ("IBOP") and spoke with compliance officer Wendy Shiell about the requirements
7  for ventilated cabinets in compounding laboratories.
8      15.   On January 8, 2016, the IBOP informed Ms. Miller that lab employees may not
9  compound hormones without a ventilated cabinet which vents air outside of the room in which
10 the materials were compounded pursuant to Idaho state law.
11     16.   Ms. Miller subsequently emailed Mr. Jungert on January 11, 2016, stating lab
12 employees would not work in the lab until they had working ventilated cabinets which vented
13 outside of the basement laboratory. All three lab employees, which included Mariah Middleton,
14 went home.
15     17.   On January 12, 2016, Miller filed a complaint with the IBOP regarding, in part,
16 the lack of functioning ventilated cabinets. The lab employees returned to compounding
17 hazardous drugs after Irwin Drug installed a new ventilated cabinet and claimed it had both the
18 new and old cabinets inspected and certified on January 18, 2016.
19     18.   On February 4 and 5, 2016, IBOP Compliance Officer Shiell conducted an
20 inspection of Irwin Drug's lab.
21     19.   The IBOP found Irwin Drug non-compliant in several areas, and specifically
22 noted Irwin Drug's failure to provide a ventilated cabinet compliant with Idaho state law.
23     20.   Officer Shiell notified Irwin Drug's pharmacist-in-charge and Miller regarding
24 the results of her inspections a week later via email. In the same email, Officer Shiell noted that
25 the two cabinets inexplicably passed certifications in January 2016 despite not having "the
26 appropriate filters installed," requiring the lab technicians to "wipe [the cabinets] out to
27 continue compounding" when she observed operations during her inspections.
28

COMPLAINT FOR VIOLATIONS OF 29 U.S.C. §660(C)

1   21.     On February 11, 2016, Mses. Conner and Miller met with Mr. Jungert and Ms.
2  Blewett to discuss the adequacy of the ventilated cabinets for compounding hazardous drugs.
3  Mr. Jungert asked Mses. Conner and Miller if they would continue to compound. Mses. Conner
4  and Miller agreed to perform tasks that did not involve hazardous drugs following the IBOP's
5  previous instruction to them. As a result, Mr. Jungert was "livid" with Mses. Conner and
6  Miller.
7   22.     On February 12, 2016, Mses. Conner and Miller alleged Mr. Jungert sent them
8  home and instead had an individual named Kenzie (a non-lab employee) and Ms. Middleton
9  complete non-hazardous drug tasks. Ms. Miller asked Mr. Jungert if they were being fired and
10 Mr. Jungert said, "I have to figure out the hood situation."
11  23.     After cutting Mses. Conner and Miller's hours, Irwin Drug increased Ms.
12 Middleton's work hours and her wage rate despite Ms. Miller being told only days before by
13 Irwin Drug's management that "there will not be any wage increases until Irwin Drug has
14 financially restructured."
15  24.     In this way, Mr. Jungert reduced the hours and, as a result, pay of Mses. Conner
16 and Miller for engaging in activity protected by the OSH Act.
17  25.     Over the next several weeks, Ms. Miller emailed Irwin Drug several times
18 asking when she could return to work.
19  26.     On March 1, 2016, Blewett emailed Mses. Conner and Miller to return Ms.
20 Conner to the lab with diminished hours alongside Ms. Middleton and two other employees,
21 but not Ms. Miller. Ms. Blewett represented that Irwin Drug could not financially support both
22 Mses. Conner and Miller's wages. Miller responded asking if she was being terminated but
23 received no reply.
24  27.     Miller did not hear from Irwin Drug until March 13, 2016 when Mr. Jungert told
25 her not to return because "the compounding department is reassessing needs. We will keep you
26 posted."
27  28.     In March 2016, Mses. Conner and Miller filed complaints with OSHA because
28 of retaliation for engaging in protected activity. Thereafter, Ms. Miller discovered Irwin Drug

COMPLAINT FOR VIOLATIONS OF 29 U.S.C. §660(C)

failed to make two contributions to her 401K plan dating back to January 2016, and amended her complaint to add this nonpayment as another form of retaliation.

29. In a statement to an OSHA investigator, Irwin Drug's pharmacist-in-charge, Ms. Van Horn, conceded that the ventilated cabinet Irwin Drug purchased in January 2016 was not the correct type, which required a replacement to be purchased. According to Van Horn, the procurement of the appropriate type of ventilated cabinet "was a never-ending mistake."

30. On March 16, 2016, the Boise area OSHA office conducted an inspection of Irwin Drug's lab following receipt of a phone call and online complaint filed by Ms. Conner on March 10, 2016. Ms. Conner's complaint alleged employee exposure to hormones without an adequate ventilated cabinet, PPE, and training. During his inspection of Irwin Drug's lab, the OSHA compliance officer (CSHO) noted a "thin coating of dust" on his hands and face.

31. Following the OSHA inspection, Mr. Jungert yelled at Ms. Conner.

32. On the morning of March 21, 2016, Ms. Conner emailed Mr. Jungert to quit because she feared for her health due to Irwin Drug's repeated inability to provide a safe work environment.

33. Later that evening, Mr. Jungert emailed Ms. Miller claiming that he had not terminated her employment and asked her to return to work.

34. On March 22, 2016, Ms. Miller emailed Mr. Jungert requesting he "finalize [her] termination." Ms. Miller stated that she could not return to work because of Mr. Jungert's prolonged lack of communication with her combined with the unsafe work environment he created and maintained at Irwin Drug.

35. On May 22, 2016, Ms. Conner resigned because she felt she could no longer work at Irwin Drug.

36. The Boise area OSHA office issued Irwin Drug a hazard alert letter, which described the reproductive and carcinogenic health effects from exposure to hormones as well as engineering control measures to reduce exposure. The Boise area OSHA office also issued Irwin Drug related citations for failing to assess the workplace for hazards requiring PPE; failing to require face protection to prevent injury; allowing food and beverage consumption in

COMPLAINT FOR VIOLATIONS OF 29 U.S.C. §660(C)

1   the lab; failing to develop and implement a hazard communication program; and failing to
2   provide training on hazardous chemicals. These five citations totaled $21,202.

3       37.    After the termination of their employment at Irwin Drug, Mr. Jungert proceeded
4   to promulgate disparaging rumors about Mses. Conner and Miller to the local Grangeville
5   community. For example, Mr. Jungert contacted Ms. Miller's subsequent employer in an
6   attempt to interfere with her subsequent employment.

7       38.    Both Mses. Conner and Miller have lost significant back wages, experienced
8   emotional distress, and incurred out-of-pocket expenses as a result of Irwin Drug's conduct in
9   violaton of § 11(c). Mses. Miller and Conner have also lost fringe benefits such as unpaid
10  401(k) contributions.

## PRAYER FOR RELIEF

12      39.    WHEREFORE, cause having been shown, the Secretary of Labor prays for a
13  Judgment against Defendant as follows:

    a)    For an Order permanently enjoining Defendant, its officers, agents, servants, employees and all persons acting or claiming to act in their behalf and interest from violating the provisions of § 11(c)(1) of the Act, 29 U.S.C. §660(c)(1); and

    b)    For all appropriate relief as follows:

    1.    Payments to Mses. Conner and Miller for reduced and lost wages and benefits including interest thereon, compensatory damages, plus pre- and post-judgment interest accruing thereon; and

    2.    For reinstatement of Mses. Conner and Miller at their regular wage rates;

    3.    For an Order directing Defendant to expunge any adverse references from Mses. Conner and Miller's personnel record;

    4.    For an Order directing Defendant to certify its compliance with state and federal regulations regarding engineering controls and personal protective equipment in pharmaceutical laboratories;

5. For an Order directing Defendant and its officers, supervisors, and lead employees to be trained in the whistleblower provisions of the Act;

6. For an Order directing Defendant and its officers, supervisors, and lead employees to cease disparaging Mses. Conner and Miller regarding their employment at Defendant and their protected activity; and

7. For an Order requiring Chad Jungert to post a Notice for ninety (90) days, in a prominent place at its location at Grangeville, Idaho, that Defendant will not in any manner discriminate or retaliate against employees who engage in activities protected by Section 11(c) of the Act; and

8. For an Order granting such other and further relief as may be necessary and appropriate in this action, including costs and attorneys' fees.

Respectfully submitted, this __ day of ____.

ELENA GOLDSTEIN
Deputy Solicitor of Labor

JANET M. HEROLD
Regional Solicitor

BRUCE L. BROWN
Associate Regional Solicitor

By:  Eduard Meleshinsky
EDUARD MELESHINSKY
Trial Attorney
U.S. DEPARTMENT OF LABOR

COMPLAINT FOR VIOLATIONS OF 29 U.S.C. §660(C)